IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| **AVEPOINT, INC.** ) | |
| ) | |
| **AVEPOINT PUBLIC SECTOR, INC.,** ) | |
| ) | |
| **GARY HERMAN,** ) | |
| ) | |
| **Plaintiffs** ) | |
| **v.** ) | **Case No.** 7:18CV55 |
| ) | |
| **METALOGIX SOFTWARE US, INC.** ) | |
| ) | |
| **GARTH LUKE,** ) | |
| ) | |
| **Defendants.** ) | |

## COMPLAINT

Plaintiffs AvePoint, Inc. ("API") and AvePoint Public Sector, Inc. ("APSI"), (together, "AvePoint"), and Gary Herman ("Herman"), (collectively, "Plaintiffs"), for their Complaint against Defendants Metalogix Software US, Inc. ("Metalogix") and Garth Luke ("Luke"), (collectively, "Defendants"), allege as follows:

## PARTIES

1.      API is a Delaware corporation with its operational headquarters in Richmond, Virginia.  API is a leading provider of infrastructure management solutions for Microsoft® SharePoint® products and technologies.

2.      APSI is a Virginia corporation with its principal place of business in Arlington, Virginia.  APSI is a wholly owned subsidiary of API.  APSI works extensively with customers in every branch of the U.S. Armed Forces, Federal Civilian and Intelligence agencies, as well as State and Local Governments to provide infrastructure management solutions for Microsoft® SharePoint® products and technologies.

WOODS ROGERS PLC
ATTORNEYS AT LAW

{2285898-1, 109110-00001-05}

3.      Herman is a resident of Ashburn, Virginia.  Herman currently is employed by APSI as its Director, Federal Programs.  Herman formerly was employed by Metalogix as its Sr. Partner Account Manager-Strategic Alliances and Integrators | Public Sector | Global Channels.

4.      Metalogix is a Delaware corporation with its principal place of business in the District of Columbia.  Metalogix is in the business of providing competitive software for Microsoft® SharePoint® products and technologies.

5.      Luke is a resident of Austin, Texas.  Luke currently is employed by Metalogix as its Senior Vice President, Strategic Business.  Luke formerly was employed by API.

## JURISDICTION AND VENUE

6.      This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338 and 15 U.S.C. §§ 1116 and 1121.  This Court has supplemental jurisdiction over state law claims under 28 U.S.C. § 1367.

7.      This Court has personal jurisdiction over Defendants because they conduct and have conducted ongoing and continuous business in Virginia, and because they are subject to jurisdiction under Virginia Code § 8.01-328.1.  Defendants have solicited, engaged in business dealings and contracted with persons and entities in Virginia.  Defendants have interfered with contracts of businesses incorporated and headquartered in Virginia.  Defendants have purposefully directed their business activities toward Virginia.  Through their conduct, Defendants have purposefully availed themselves of the privileges of conducting business in Virginia.  While engaging in their conduct, it was reasonably foreseeable that Defendants would be subjected to this Court's jurisdiction.

8.     Venue in this Court is proper under 28 U.S.C. § 1391 (b) and (c) in that Defendants are subject to personal jurisdiction in this District and a substantial part of the events or omissions giving rise to the claim occurred in this District.

## NATURE OF THE ACTION

9.     This action arises out of:  (a) Luke's breaches of his contractual duties owed to AvePoint under his Separation Agreement (the "Separation Agreement") (Count 1); (b) Metalogix's tortious interference with the Separation Agreement (Count 2); (c) Defendants' defamation of AvePoint (Count 3); and (d) Defendants' tortious interference with AvePoint's customer relationships (Count 4).  Plaintiffs also seek a declaratory judgment (Count 5) that Metalogix's Confidentiality, Non-Interference and Invention Assignment Agreement with Herman (the "Metalogix Any Capacity Worldwide Non-Compete Agreement") is invalid and unenforceable.  This action also arises out of Metalogix's trademark infringement (Count 6) and unfair competition and false designation of origin (Count 7) arising under the Lanham Act of 1946, 15 U.S.C. §§ 1051, et seq.; violations of the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d) (Count 8); and trademark infringement (Count 9) and unfair competition (Count 10) under the laws of Virginia.

10.     AvePoint seeks injunctive relief and monetary damages against Defendants to prevent and compensate for actual and threatened injury to AvePoint in its business, trade and reputation arising from these breaches of contract (Count 1), tortious interference with contract (Count 2), defamation (Count 3), tortious interference with customer relationships (Count 4), trademark infringement (Count 6), unfair competition and false designation of origin (Count 7), cybersquatting (Count 8), trademark infringement (Count 9) and unfair competition (Count 10).

11.     AvePoint also seeks an award of punitive damages (Counts 2-4) against Defendants.  Plaintiffs seek a declaration that the Metalogix Any Capacity Worldwide Non-Compete Agreement is invalid and unenforceable (Count 5).  AvePoint also seeks recovery of all of Metalogix's profits or gains of any kind resulting from its willful trademark infringement, unfair competition and cybersquatting trebled pursuant to 15 U.S.C. § 1117 (Counts 6-10).

## FACTUAL ALLEGATIONS

### AvePoint's Business and Confidential Information

12.     AvePoint develops, licenses and supports infrastructure management and governance software platforms for Microsoft® SharePoint® products and technologies in the public and private sectors.  Over 15,000 companies and 5 million cloud users worldwide trust AvePoint to accelerate the migration, management, and protection of their Office 365 and SharePoint data.

13.     AvePoint produces DocAve, including various versions such as DocAve v5, DocAve 6, DocAve 6.0 and DocAve 6.9 (collectively "DocAve"), its flagship award-winning SharePoint® software platform, and other products including Governance Automation and Compliance Guardian.

14.     AvePoint, through extensive effort and the expenditure of considerable amounts of time and money over many years, has developed commercially valuable confidential and proprietary information, including, but not limited to, AvePoint's customer lists, customer files and records, deal pipelines, lists of existing, pending and prospective projects, bids and orders, customer preferences and requirements, cost and pricing information, pricing strategies and sales plans, product design and development information, software code, profit margin information for products and services, and other confidential and proprietary information which would cause

WOODS ROGERS PLC
ATTORNEYS AT LAW

competitive harm to AvePoint if misappropriated, disclosed or used by others ("AvePoint Confidential Information").

15.     This AvePoint Confidential Information is a valuable commercial asset of AvePoint, and AvePoint has guarded the secrecy of this AvePoint Confidential Information from disclosure to competitors or other persons and entities outside of AvePoint.  AvePoint derives independent economic value from this AvePoint Confidential Information not being generally known or readily ascertainable by other persons or entities, and at all times AvePoint has engaged in reasonable efforts to maintain the secrecy of this AvePoint Confidential Information.

### The AvePoint® Mark

16.     AvePoint owns U.S. Registration No. 3,388,031 for the "AvePoint" word mark ("the AvePoint® Mark") which was issued on the Principal Register by the United States Patent and Trademark Office on February 26, 2008.  A copy of the registration certificate for the AvePoint® Mark is attached hereto as **Exhibit 1** and is incorporated herein by reference. AvePoint's federal trademark registration gives AvePoint the exclusive right to use the AvePoint® Mark throughout the United States.

17.     AvePoint has made a substantial investment in the promotion and protection of the AvePoint® Mark and considers the AvePoint® Mark among its most important and valuable assets.  The AvePoint® Mark confers the exclusive right, among other things, to exploit commercially the AvePoint® Mark and to bar use by third parties of any substantially similar marks.

### API Hires Luke

18.     In or around November 2008, API hired and employed Luke.

WOODS ROGERS PLC
ATTORNEYS AT LAW

19.     During his employment with API from November 2008 until February 2016, Luke was responsible for, among other things, strategic sales and marketing.

20.     Over the course of his employment with API, API trained Luke and disclosed AvePoint Confidential Information to Luke and entrusted Luke with this AvePoint Confidential Information.   Luke understood that the misuse or disclosure of this AvePoint Confidential Information would be detrimental to AvePoint and that AvePoint would suffer great loss and damage if Luke should, on his own behalf or on behalf of any other person or entity, misuse or disclose any of this AvePoint Confidential Information.

21.     Among the AvePoint Confidential Information disclosed to Luke were AvePoint customer, product and services information, including, but not limited to, AvePoint's customer lists, customer files and records, deal pipelines, lists of existing, pending and prospective projects, bids and orders, customer preferences and requirements, cost and pricing information, pricing strategies and sales plans, product design and development information and profit margin information for products and services.

22.     Luke further developed customer and prospective customer contacts and as a consequence of his employment, AvePoint owned all work product developed by Luke in the course of his employment with API.

23.     Over the course of his employment with API, Luke had frequent contact, communication and dealings with AvePoint's existing and prospective customers and partners.

**AvePoint Addresses Metalogix's Predecessor's False Advertising Campaign**

24.     AvePoint takes pride in the fact that that it is a U.S. based company, and all of its high level product maintenance, software design, detailed software design, and assembly and packaging is done in the United States.  This source and origin of its business, goods and/or

services has a significant impact on its customers' willingness and/or ability to buy AvePoint software and/or services.  United States government customers, for example, are required to engage in business with U.S. entities and give preference to domestic end products, including software, for supplies acquired for use in the United States.  See 41 U.S.C. 10(a)-(d) ("Buy American Act"); 48 C.F.R. 52.225-1.

25.     On December 4, 2013, the U.S. Customs and Border Protection ("CBP"), the division of the Department of Homeland Security charged with determining whether an article is or would be a product of a designated country for purposes of U.S. Government procurement, issued a final determination attached hereto as **Exhibit 2** (the "Final Determination") concluding that AvePoint's "software build operations performed in the United States substantially transforms the software modules developed in China and the U.S. into a new article with a new name, character and use, that is, DocAve Software.  As such, DocAve Software is considered a product of the United States for purposes of U.S. Government procurement."    The Final Determination is published at Federal Register / Vol. 78, No. 238 / Wednesday, December 11, 2013  /Notices,  https://www.federalregister.gov/documents/2013/12/11/2013-29586/notice-of-issuance-of-final-determination-concerning-docave-computer-software.

26.     Unfortunately, one of AvePoint's competitors sought to deny AvePoint's U.S. status for commercial gain. Metalogix's predecessor, Power Tools, Inc. d/b/a Axceler ("Axceler") implemented a false advertising campaign designed to falsely convince consumers that AvePoint was a Chinese entity whose products are not made, supported or developed in the United States (despite the fact that AvePoint is indisputably a U.S. company whose products are made, supported and developed in the U.S.).  Axceler's false advertising campaign forced

AvePoint to take legal action to correct the record within the industry, protect its rights and put a stop to Axceler's unlawful activities.

27.    AvePoint filed a lawsuit against Axceler for defamation, false advertising and unfair competition in the Western District of Virginia captioned *AvePoint, Inc. and AvePoint Public Sector, Inc. v. Power Tools, Inc. d/b/a Axceler and Michael X. Burns*, Civ. Action No. 7:13-cv-00035 (the "Axceler Lawsuit").

28.    At the conclusion of the Axceler Lawsuit, Chief United States District Judge Glen Conrad entered an Order attached hereto as **Exhibit 3** (the "Final Order"), whereby Axceler acknowledged the existence and accuracy of the Final Determination and expressed regret for its statements which "portrayed  AvePoint as Chinese companies and portrayed that AvePoint's products are not United States products."

29.    As an API employee who was actively involved in the Axceler Litigation, Luke was fully aware of the Final Determination, the Final Order and AvePoint's true status as a U.S. company whose products are made, supported and developed in the U.S.

30.    On August 28, 2013, Metalogix announced its purchase of Axceler's SharePoint business, including its products, employees, assets and brands.  Metalogix's press release attached hereto as **Exhibit 4** (the "Press Release") stated:  "Metalogix, the leading provider of content infrastructure software to improve the use and performance of enterprise content on Microsoft SharePoint, Exchange and Cloud platforms, announced it has acquired Axceler's highly successful and profitable SharePoint business, including the industry's widely used and most powerful governance and administration product, ControlPoint for SharePoint Administration. The acquisition of Axceler's related products, employees, assets and brands, positions Metalogix as the fastest growing SharePoint-focused Independent Software Vendor

(ISV) in the world."   The Press Release is published at http://www.metalogix.com/News-Detail/13-08-28/Metalogix_Acquires_Axceler_s_SharePoint_Business.aspx.

31.     As Axceler's successor, Metalogix was fully aware of the Final Determination, the Final Order and Axceler's acknowledgement of the existence and accuracy of the Final Determination and expression of regret for its statements which "portrayed AvePoint as Chinese companies and portrayed that AvePoint's products are not United States products."

**Luke Resigns From API and Enters Into The Separation Agreement**

32.     On or about February 16, 2016, Luke resigned from his employment as API's Corporate Vice President, North America.

33.     On or about February 24, 2016, Luke and API executed and entered into the Separation Agreement attached hereto as **Exhibit 5** (the "Separation Agreement").

34.     Pursuant to the  Separation Agreement, Luke agreed, among other things:  (a) to return all AvePoint property in his possession without retaining any copies (Section 8); (b) not to misuse or disclose any AvePoint trade secrets or confidential or proprietary information either during or after his employment, "specifically including pricing, margins, customer contact lists obtained from the Company's CRM system," (Section 10a); and  (c) not to "bad-mouth" AvePoint "or make false or misleading comments about" AvePoint (Section 11).

**Luke Joins Metalogix, Violates The Separation Agreement, Misappropriates
AvePoint Confidential Information And Engages in Other Unlawful Activities**

35.     At all times since his execution of the Separation Agreement on February 24, 2016, Luke has been aware of the existence and terms of the Separation Agreement and the necessity of his compliance with and performance of the Separation Agreement.

36.     Despite being aware of this, Luke has breached the Separation Agreement by: (a) failing to return all AvePoint property; (b) misusing and disclosing AvePoint's migration

pricing, tool functionality and other AvePoint Confidential Information, and attempting to obtain AvePoint's customer lists and deal pipelines from its partners, including but not limited to, Carahsoft Technology Corp. ("Carahsoft"); and (c) disparaging and bad-mouthing AvePoint and making false and misleading comments about AvePoint to its existing and prospective customers and partners and others.

37.     Metalogix is aware of the existence and terms of the Separation Agreement and the necessity of its compliance and non-interference with the Separation Agreement.

38.     Despite being aware of the existence and terms of the Separation Agreement and the necessity of its compliance and non-interference with the Separation Agreement, Metalogix has intentionally and willfully tortiously interfered with the Separation Agreement by enabling Luke to: (a) retain AvePoint property; (b) misuse, disclose and attempt to obtain AvePoint Confidential Information; and (c) disparage and bad-mouth AvePoint and make false and defamatory statements about AvePoint, all in an effort to solicit and secure business from AvePoint's existing and prospective customers.

39.     Specifically, Luke on behalf of Metalogix, has used and exploited AvePoint's migration pricing to undercut and underbid AvePoint and has disparaged and bad-mouthed AvePoint, claiming that AvePoint's products are functionally inferior, untested and unproven, all in an effort to solicit and secure business from AvePoint's existing and prospective customers, including but not limited to, BHP Billiton Limited, Santos Limited and U.S. Africa Command ("AFRICOM").

40.     Through his misuse of AvePoint Confidential Information, Luke knew about the AFRICOM deal and positioned Metalogix to participate and win the bid.  Luke used AvePoint's

position/pricing information against AvePoint and, as a result, Metalogix underbid AvePoint and won the contract at $546,000.

41.     Moreover, during Metalogix sales team conference calls, Garth has repeatedly mentioned that he has AvePoint's pricing/model and thus knows how to favorably position Metalogix against AvePoint on large deals and sales.  Ryan Mommaerts, Metalogix's former Partner Channel Manager, has confirmed that at a Partner Summit Meeting with Summit 7 Systems, Luke made a presentation stating:  "Metalogix does not eat your lunch, AvePoint will. I know because I helped them build it; they will take deals away from you . . . they have no partner program."

42.     On many occasions, including in or around June 2017, Luke recruited other Metalogix employees, including Alec Wyhs, Sr. Account Manager who handles an account with at ESVA Inc., to aid in his efforts to obtain AvePoint's customer lists and deal pipeline.  During a meeting with Carahsoft VP Mike Schrader, Luke pressured him to cease doing business with AvePoint and work exclusively with Metalogix.  Fortunately, Carahsoft thus far has resisted Luke's and Metalogix's efforts to obtain AvePoint customer lists and deal pipelines and interfere with AvePoint's business relationship with Carahsoft.

43.     Luke and Metalogix are interfering with AvePoint's customer relationships by improper means or methods, including, using AvePoint Confidential Information to underbid AvePoint for customer jobs, projects, contracts and business for purposes of stealing away AvePoint's customers   As a result of these unlawful actions, Metalogix already has misappropriated a number of customers from AvePoint and AvePoint has lost customer jobs, projects, contracts and business.

44.     As of the date of this filing, Defendants already have misappropriated a number of customers from AvePoint, including, but not limited to, AFRICOM, and continue to do so. AvePoint has lost and is continuing to lose customer jobs, projects, contracts and business due to Defendants using AvePoint Confidential Information to contact AvePoint's customers and underbid AvePoint, and otherwise misuse and disclose AvePoint Confidential Information in competition with AvePoint for purposes of stealing away AvePoint's customers.

45.     Moreover, despite being prohibited from bad-mouthing or making false or misleading comments about AvePoint under his Separation Agreement, and despite possessing full knowledge of the Final Determination, the Final Order and AvePoint's true status as a U.S. company whose products are made, supported and developed in the U.S., Luke on behalf of Metalogix, is attempting to reactivate the false advertising campaign and falsely convince AvePoint's existing and prospective customers and partners that AvePoint is a Chinese entity whose products are not made, supported or developed in the United States.

46.     Since earlier in 2017, Luke on behalf of Metalogix has made false and defamatory statements of fact to existing and prospective customers and partners and others that: (a) AvePoint is a Chinese (rather than U.S.) company; and (b) AvePoint's software is not made, developed or supported in the U.S.

47.     Luke has frequently called AvePoint a "Chinese" company during in person meetings and conference calls with other Metalogix sales personnel and external partners.  Luke also has instructed them that AvePoint's status as a "Chinese" company should be conveyed to Federal customers to discourage them from doing business with AvePoint.  Ryan Mommaerts has confirmed this.  Luke also emphasized AvePoint's "Chinese Factor" in threatening to

blackball four partners from Metalogix (Xgility, Summit 7, DocPoint and CSRA) unless they signed contracts agreeing not to do business with AvePoint.

48.     In a Washington Business Journal article published on January 18, 2018, an unnamed Metalogix executive stated that AvePoint is "unethical" for making the truthful statement that Metalogix is for sale.  Metalogix has not and cannot deny that it is selling out. Instead, in an attempt to distract customers from this truth, Metalogix has made false and defamatory statements of fact about AvePoint being "unethical."  There is nothing unethical about AvePoint speaking the truth.  To quote the Washington Post: Democracy Dies in Darkness. https://www.washingtonpost.com/.

49.     In addition to being a weapon of mass distraction, Metalogix's false and defamatory statements of fact about AvePoint being "unethical" are designed and intended to disparage AvePoint professionally in its trade and profession.

50.     Finally, AvePoint's name and the AvePoint® Mark are being used on the internet improperly and without authorization to divert potential customers from AvePoint to Metalogix. Specifically, as the screenshots attached hereto as **Exhibits 6-8** confirm, Metalogix has purchased and acquired the domain names www.avepointservice.com and www.avepointservices.com which contain the AvePoint® Mark in their URLs (the "Infringing Domain Names") and are using the Infringing Domain Names to divert potential customers to Metalogix's website or a replica thereof.

51.    As the screenshots below confirms, Metalogix owns and operates the Infringing Domain Names and/or uses the Infringing Domain Names in bad faith to divert potential customers from AvePoint to Metalogix and thereby cause and benefit from customer confusion.



**Defendants' Actions Have Caused Great Harm To AvePoint's Business**

52.    Defendants have injured AvePoint by, among other things, breaching and tortiously interfering with the Separation Agreement and AvePoint's customer relationships, misappropriating, using and disclosing AvePoint Confidential Information for competitive purposes, infringing the AvePoint® Mark, unfairly competing with AvePoint, cybersquatting and engaging in other unlawful activities.

53.    By engaging in this and other similar conduct, Luke has breached his Separation Agreement (Count 1) defamed AvePoint (Count 3), and tortiously interfered with AvePoint's relationships with customers (Count 4).  All of this has caused great damage to AvePoint.

54.    By engaging in this and other similar conduct, Metalogix has tortiously interfered with the Separation Agreement (Count 2), defamed AvePoint (Count 3), and tortiously interfered with AvePoint's relationships with customers (Count 4).   Metalogix also has infringed the AvePoint® Mark (Count 6), engaged in unfair competition and false designation of origin (Count 7), cybersquatted (Count 8) and engaged in trademark infringement (Count 9) and unfair competition (Count 10) under the laws of Virginia.   All of this has caused great damage to AvePoint.

55.    Defendants' actions, both individually and collectively, have proximately caused and will continue to proximately cause AvePoint to suffer immediate and irreparable harm, unless Defendants are preliminarily and permanently enjoined to: (a) honor the Separation Agreements with and legal obligations to AvePoint; (b) return to AvePoint and refrain from misappropriating, using or disclosing AvePoint Confidential Information; (c) refrain from making further defamatory statements about AvePoint; and (d) refrain from any other improper or illegal actions.

56.    AvePoint has no adequate remedy at law.   Without preliminary and permanent injunctive relief prohibiting Defendants from continuing to engage in these unlawful activities, AvePoint will continue to suffer immediate and irreparable harm.

57.    By engaging in this and other similar conduct, Defendants have solicited and induced AvePoint's customers to terminate their relationships with AvePoint in order to enter into contracts with, and obtain products and services from Defendants.

58.    Further, Defendants have misappropriated AvePoint Confidential Information in competition with AvePoint for purposes of stealing away AvePoint's customers.

WOODS ROGERS PLC
ATTORNEYS AT LAW

59.     By misappropriating AvePoint Confidential Information, Defendants have obtained a substantial competitive advantage at the expense of AvePoint.

60.     Defendants intentionally, willfully, and purposefully interfered with AvePoint's relationships with its customers by improper means or methods, including, but not limited to, using AvePoint Confidential Information to underbid AvePoint for customer jobs, projects, contracts and business for purposes of stealing away AvePoint's customers.

61.     Moreover, Metalogix has used AvePoint's name and the AvePoint® Mark on the internet improperly and without authorization to divert potential customers from AvePoint to Metalogix.  Specifically, Metalogix has purchased and acquired the Infringing Domain Names (which contains the AvePoint® Mark in their URLs) and are using the Infringing Domain Names to divert potential customers to Metalogix's website or a replica thereof.  This conduct has caused consumer confusion as to AvePoint's endorsement of, affiliation with, and/or sponsorship of the Infringing Domain Names owned or operated and/or used by Metalogix and confusion as to the products offered through those websites.





62.     Through these websites, Metalogix has passed itself off as AvePoint for the purpose of diverting business from AvePoint to Metalogix and/or otherwise causing AvePoint competitive harm. Through these actions, Metalogix has offered and/or sold products to consumers using the AvePoint® Mark in a manner that is likely to cause confusion, and in a manner that has, in fact, caused confusion.

**Metalogix Threatens Immanent Litigation Over Non-Compete Agreement**

63.     On or about November 22, 2017, Metalogix, through counsel, sent cease and desist letters to Plaintiffs attached as **Exhibits 9-10** (the "Metalogix Cease and Desist Letters") alleging that AvePoint's employment of Herman violated the Metalogix Any Capacity Worldwide Non-Compete Agreement and threatening that litigation would be imminent unless Plaintiffs met Metalogix's demands.

WOODS ROGERS PLC
ATTORNEYS AT LAW

64.     Plaintiffs have received and reviewed the Metalogix Cease and Desist Letters and the attached Metalogix Any Capacity Worldwide Non-Compete Agreement.

65.     Plaintiffs have determined that the Metalogix Any Capacity Worldwide Non-Compete Agreement is invalid and unenforceable for numerous reasons, including that:

> (a) it has no geographic limitation and in its own words restricts competition "**anywhere in the world**;"

> (b) it has no functional limitation and in its own words restricts competition "**in any capacity**;"

> (c) it applies to Metalogix's "**direct and indirect parents and subsidiaries**" of whom Mr. Herman is unaware and for whom Mr. Herman never worked;

> (d) it restricts activities that Metalogix and its unknown affiliates do not perform but merely had "**plans to engage in**;"

> (e) it restricts hiring anyone employed by Metalogix or its unknown affiliates within the past 6 months to non-competitive positions; and

> (f) it restricts soliciting "any client account, customer, licensee or other business relation" of Metalogix or its unknown affiliates.

66.     Black letter Delaware law and Virginia law confirms that this non-compete and non-solicitation provision is invalid and unenforceable.  *See, e.g., Capital Bakers, Inc. v. Leahy*, 178 A. 648, 650 (Del. Ch. 1935) (finding prohibition in covenant not to compete on working in three state area to be unreasonable when employee's knowledge of customers and affairs was limited to Wilmington plant); *Knowles-Zeswitz Music, Inc. v Cara*, 260 A.2d 171, (Del. Ch. 1969) (recognizing 100 mile radius to be too broad and limiting area to school districts for which employee had been the sole representative for employer's interests in the last year of his employment); *See Carcas v. The American Original Corp.*, Civ. Action No. 1258, 1987 Del. Ch. LEXIS 467, *5 (Del. Ch. July 31, 1987)(finding covenant not to compete to be unreasonable when it had no geographical limitation); *See Prof'l Investigations & Consulting Agency, Inc. v.*

WOODS ROGERS PLC
ATTORNEYS AT LAW

*Kingsland*, 69 Ohio App. 3d 753, 759-60 (1990) (holding that non-competition provision was invalid and unenforceable because "[t]he agreement places no … geographic limitations on the covenant" and "[i]t purports to restrict solicitation of any past clients of [the former employer] regardless of whether [the former employer] had a business relationship with the client at or near the time of [the employee's] discharge"); *Simmons v. Miller*, 261 Va. 561, 581, 544 S.E. 2d 666, 678 (2001) (striking non-compete provision that restricted activity broader than the former employer's business activity over an unlimited geographic area); see *Cantol, Inc. v. McDaniel*, Case. No. 2:06cv86, 2006 WL 1213992, at *12, 2006 U.S. Dist. LEXIS 24648 (April 28, 2006 E.D.Va.) (noting "the Supreme Court of Virginia has never upheld a restrictive covenant ancillary to an employment contract when the restrictive covenant could be applied to a geographic area in which the employee performed no function for the employer"); *Lanmark Technology, Inc. v. Canales*, 454 F. Supp. 2d 524, 527-30 (E.D.Va. 2006) (non-competition clause was excessive to the extent that it prohibited "a former employee from any form of employment with a competitor, including work unrelated to the employee's work [for former employer]"); *Nortec Com., Inc. v. Lee-Llacer*, 548 F. Supp. 2d 226, 230 (E.D.Va. 2008) (granting motion to dismiss "because the functions that are proscribed by the non-compete agreement are not limited to the functions that were performed by Mr. Lee-Llacer when he was a Nortec employee").

67.     In any event, based on Metalogix's recent conduct in the marketplace, Metalogix will be the precluded from enforcing the Agreement due to its unclean hands.  A party seeking injunctive or equitable relief "must come with clean hands"—that is, free of "fraud, illegality, tortious conduct or the like" regarding the matter in question.  *Cline v. Berg*, 273 Va. 142, 147, 639 S.E.2d 231, 233-34 (2007) (citing *Richards v. Musselman*, 221 Va. 181, 185, 267 S.E.2d

164, 166 (1980)) ("He who comes into equity must come with clean hands . . . [T]he complainant seeking equitable relief must not himself have been guilty of any inequitable or wrongful conduct with respect to the transaction or subject matter sued on."); *Butler v. Hayes*, 254 Va. 38, 43, 487 S.E.2d 229, 232 (1997) ("a litigant who seeks to invoke an equitable remedy must have clean hands"); *Firebaugh v. Hanback*, 247 Va. 519, 526, 443 S.E.2d 134, 138 (1994) ("[h]e who asks equity must do equity, and he who comes into equity must come with clean hands"); *McNeir v. McNeir*, 178 Va. 285, 290, 16 S.E.2d 632, 633 (1941) ("a plaintiff must come in with clean hands, that is, he must be free from reproach in his conduct"); *Walker v. Henderson*, 151 Va. 913, 927, 145 S.E. 311, 315 (1928).

### COUNT 1.
### BREACH OF CONTRACT
#### (Against Luke for Breach of his Separation Agreement)

68.     AvePoint repeats and realleges the allegations contained in all of the preceding paragraphs of the Complaint, as though fully set forth herein.

69.     The Separation Agreement is a valid, binding and enforceable contract.

70.     AvePoint performed and met its obligations under the Separation Agreement.

71.     Luke has breached his obligations under the Separation Agreement by, among other ways:  (a) failing to return all AvePoint property; (b) misusing and disclosing AvePoint's migration pricing, tool functionality and other customer, project, pricing and product information, and attempting to obtain AvePoint's customer lists and deal pipeline from AvePoint's partners, including but not limited to, Carahsoft; and (c) disparaging and bad-mouthing AvePoint and making false and misleading comments about AvePoint to AvePoint's existing and prospective customers and partners and others.

72.     Luke's material breaches of his Separation Agreements have proximately caused AvePoint to suffer damages, including, but not limited to, lost profits, loss of goodwill, loss of competitive advantage, loss of business opportunities, damage for business interruption and other damages, and AvePoint is entitled to recover these damages from Luke.

73.     Absent preliminary and permanent injunctive relief, Luke's breaches of his Separation Agreement will continue to cause irreparable injury to AvePoint and its business.

**COUNT 2.**
**TORTIOUS INTERFERENCE WITH CONTRACT**
**(Against Metalogix for Tortious Interference with the Separation Agreement)**

74.     AvePoint repeats and realleges the allegations contained in all of the preceding paragraphs of the Complaint, as though fully set forth herein.

75.     A valid and binding contractual relationship exists between Luke and AvePoint in the form of the Separation Agreement.

76.     Metalogix knew and knows that the Separation Agreement existed and exists between Luke and AvePoint.

77.     Notwithstanding its knowledge of the Separation Agreement, Metalogix intentionally, willfully and purposefully interfered with AvePoint's contractual relationship with Luke by hiring and employing Luke and enabling Luke to, among other things: (a) retain AvePoint property; (b) misuse and disclose and attempt to obtain AvePoint Confidential Information; and (c) disparage and bad-mouth AvePoint and make false and misleading comments about AvePoint, all in an effort to solicit and secure business from AvePoint's existing and prospective customers, including but not limited to, BHP Billiton Limited, Santos Limited and AFRICOM.

WOODS ROGERS PLC
ATTORNEYS AT LAW

78.     Metalogix's interference with AvePoint's contractual relationship with Luke directly and proximately caused Luke's breach of his Separation Agreement and the resulting damages and deprivation of benefit to AvePoint.

79.     Metalogix's tortious interference with the Separation Agreement proximately has caused AvePoint to suffer damages, including, but not limited to, lost profits, loss of goodwill, loss of competitive advantage, loss of business opportunities, damage for business interruption and other damages, and AvePoint is entitled to recover these damages from Metalogix.

80.     Absent preliminary and permanent injunctive relief, Metalogix's tortious interference with the Separation Agreement will continue to cause irreparable injury to AvePoint and its business.

81.     Metalogix's actions were taken willfully and wantonly, maliciously, intentionally, and in bad faith.

82.     As a result, AvePoint is entitled to recover punitive damages for Metalogix's wrongful conduct.

## COUNT 3.
## DEFAMATION
### (Against Defendants For Defaming AvePoint)

83.     AvePoint repeats and specifically incorporates the allegations asserted in each of the preceding paragraphs, as if fully set forth herein.

84.     Defendants have intentionally published to third parties untrue and defamatory statements concerning AvePoint in direct communications with existing and prospective customers and partners and others.

85.     Defendants' untrue and defamatory statements are set forth in detail above, but include Defendants' statements that: (a) the AvePoint is a Chinese company; (b) AvePoint's software is not made, developed or supported in the U.S; and (c) AvePoint is "unethical."

86.     These untrue and defamatory statements have disparaged AvePoint professionally in its trade and profession and constitute defamation per se.

87.     Defendants in each instance knew that the unprivileged statements that they published were materially false and/or acted in reckless disregard of said statements' falsity

88.     As a direct and proximate result of Defendants' wrongful conduct, AvePoint has and/or will suffer damages to its trade, business and reputation, and is entitled to recover the same in an amount to be proven at trial.  AvePoint is entitled to recover presumed damages because Defendants' statements constitute defamation per se.  AvePoint is entitled to recover punitive damages because Defendants' made the untrue and defamatory statements with knowledge of their falsity and/or reckless disregard of whether the statements were false.

**COUNT 4.**
**TORTIOUS INTERFERENCE**
**(Against Defendants for Tortious Interference with AvePoint's Customer Relationships)**

89.    AvePoint repeats and realleges the allegations contained in all of the preceding paragraphs of the Complaint, as though fully set forth herein.

90.    Prior to Defendants' interference, AvePoint had valid contractual relationships with its customers, and AvePoint legitimately expected to establish new customer relationships with customers.

91.    Defendants were aware of AvePoint's contractual relationships and of AvePoint's legitimate business expectation of forming new customer relationships.

92.    Defendants intentionally, willfully, and purposefully interfered with AvePoint's relationships with its customers by improper means or methods, including, but not limited to, misappropriating, using and disclosing AvePoint Confidential Information in competition with AvePoint to underbid AvePoint for customer jobs, projects, contracts and business for purposes of stealing away AvePoint's customers.

93.    As a direct and proximate cause of Defendants' tortious interference, AvePoint lost customers that AvePoint reasonably expected to retain or acquire.

94.    Defendants' tortious interference with AvePoint's customer relationships proximately has caused AvePoint to suffer damages, including, but not limited to, lost profits, loss of goodwill, loss of competitive advantage, loss of business opportunities, damage for business interruption and other damages, and AvePoint is entitled to recover these damages from Defendants.

95.    Absent preliminary and permanent injunctive relief, Defendants' tortious interference with AvePoint's customer relationships will continue to cause irreparable injury to AvePoint and its business.

96.    Defendants' actions were taken willfully and wantonly, maliciously, intentionally, and in bad faith.

97.    As a result, AvePoint is entitled to recover punitive damages for Defendants' wrongful conduct.

**COUNT 5.**
**DECLARATORY JUDGMENT**
**(Against Metalogix for Declaration of Invalidity and Unenforceability of Non-Compete)**

98.    Plaintiffs repeat and reallege the allegations contained in all of the preceding paragraphs of the Complaint, as though fully set forth herein.

99.    The Metalogix Any Capacity Worldwide Non-Compete Agreement is invalid and unenforceable because, among other reasons:  (a) it lacks a geographic scope; (b) it lacks a functional scope; (c) it restricts non-competitive activities; (d) it restricts "business relations" of "indirect parents and subsidiaries;" and (e) it is vague and ambiguous in terms of what it purports to restrict.

100.   Moreover, Metalogix is not entitled to injunctive relief because it has unclean hands resulting from its tortious interference, defamation and other unlawful actions.

101.   Plaintiffs seek a declaratory judgment that the Metalogix Any Capacity Worldwide Non-Compete Agreement is invalid and unenforceable and therefore Metalogix has no basis for commencing any action against Plaintiffs seeking injunctive relief or damages based on alleged violations of the Metalogix Any Capacity Worldwide Non-Compete Agreement.

**COUNT 6:**
**FEDERAL TRADEMARK INFRINGEMENT**
**(Against Metalogix Under 15 U.S.C. § 1114)**

102.     AvePoint repeats and realleges the allegations contained in all of the preceding paragraphs of the Complaint, as though fully set forth herein.

103.     The AvePoint® Mark and the goodwill of the businesses associated with it in the United States are of great and incalculable value, is highly distinctive, and has become universally associated in the public mind with AvePoint products and related services of the highest quality and reputation finding their source from AvePoint.   Without AvePoint's authorization or consent, Metalogix, through the Infringing Domain Names, used the AvePoint® Mark to advertise, offer for sale and/or sell products in a manner that is likely to cause confusion, mistake, and deception among the general purchasing public, all to the damage and detriment of AvePoint's reputation, goodwill, and sales.

104.     AvePoint has no adequate remedy at law, and if Metalogix's activities are not enjoined, AvePoint will continue to suffer irreparable harm and injury to its goodwill and reputation.

105.     Metalogix's actions demonstrate an intentional, willful, and malicious intent to trade on the goodwill associated with the AvePoint® Mark to AvePoint's great and irreparable injury.

106.     Metalogix is causing and will continue to cause substantial injury to the public and to AvePoint, and AvePoint is therefore entitled to injunctive relief and to recover Metalogix's profits, treble damages, as well as costs and reasonable attorneys' fees under 15 U.S.C. §§ 1114, 1116, and 1117.

## COUNT 7:
## UNFAIR COMPETITION AND FALSE DESIGNATION OF ORIGIN
### (Against Metalogix Under 15 U.S.C. § 1125(a))

107.   AvePoint repeats and realleges the allegations contained in all of the preceding paragraphs of the Complaint, as though fully set forth herein.

108.   Metalogix's knowing use of the AvePoint® Mark will continue to cause confusion, deception, and mistake among the general purchasing public, by Metalogix creating the false and misleading impression that Metalogix and the products and services linked to/from the Infringing Domain Names are affiliated, connected, or associated with AvePoint, or have the sponsorship, endorsement, or approval of AvePoint.

109.   By misappropriating and using the AvePoint® Mark, Metalogix misrepresents and falsely describes to the general public the origin and source of the products and services linked to the Infringing Domain Names and creates a likelihood of confusion by consumers as to the source of such products and services.

110.   Metalogix's acts are in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), in that Metalogix's use of the AvePoint® Mark in interstate commerce constitutes a false designation of origin and unfair competition.

111.   AvePoint has no adequate remedy at law, and if the Metalogix's activities are not enjoined, AvePoint will continue to suffer irreparable harm and injury to its goodwill and reputation.

112.   Metalogix's actions demonstrate an intentional, willful, and malicious intent to trade on the goodwill associated with the AvePoint® Mark to AvePoint's great and irreparable injury.

**COUNT 8:**
**CYBERSQUATTING UNDER THE ANTICYBERSQUATTING CONSUMER**
**PROTECTION ACT**
**(Against Metalogix Under 15 U.S.C. § 1125(d)(1))**

113.    AvePoint repeats and realleges the allegations contained in all of the preceding paragraphs of the Complaint, as though fully set forth herein.

114.    The Infringing Domain Names are confusingly similar to the AvePoint® Mark, which was already distinctive at the time that Metalogix registered this domain name.

115.    Metalogix registered and used the Infringing Domain Names with a bad faith intent to profit from the AvePoint® Mark, by using the Infringing Domain Names to host the website on which Metalogix used the AvePoint® Mark to mislead and confuse consumers searching for AvePoint products.

116.    Metalogix has no trademark or other intellectual property rights in the Infringing Domain Names or the AvePoint® Mark.

117.    Metalogix's activities, as alleged herein, violate the federal Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d)(1).

118.    AvePoint has no adequate remedy at law, and if Metalogix's activities are not enjoined, AvePoint will continue to suffer irreparable harm and injury to its goodwill and reputation.

119.    Metalogix is causing and will continue to cause substantial injury to the public and to AvePoint, and AvePoint is therefore entitled to injunctive relief, including an order requiring transfer of the Infringing Domain Names to AvePoint, and to recover maximum statutory damages. In light of the egregious and exceptional nature of Metalogix's conduct, AvePoint is further entitled to reasonable attorneys' fees within the meaning of 15 U.S.C. § 1117.

**COUNT 9:**
**TRADEMARK INFRINGEMENT UNDER VIRGINIA COMMON LAW**
**(Against Metalogix)**

120.    AvePoint repeats and realleges the allegations contained in all of the preceding paragraphs of the Complaint, as though fully set forth herein.

121.    Metalogix's conduct as alleged herein has violated and infringed AvePoint's common law rights in the AvePoint® Mark.

122.    The AvePoint® Mark is inherently distinctive or otherwise has acquired distinctiveness as a result of long-time use, advertising and promotion.

123.    Metalogix's use of the AvePoint® Mark creates the likelihood that the public, suppliers, customers, and potential customers will be confused into mistakenly believing that Metalogix or the products it provides links to through the Infringing Domain Names are in some manner associated with, or sponsored by, AvePoint.

124.    Metalogix's trademark infringement is intentional and willful.

125.    Metalogix's trademark infringement has damaged AvePoint, and unless enjoined, will continue to irreparably damage the reputation and goodwill associated with the AvePoint® Mark. AvePoint has no adequate remedy at law.

**COUNT 10:**
**VIRGINIA COMMON LAW UNFAIR COMPETITION**
**(Against Metalogix)**

126.    AvePoint repeats and realleges the allegations contained in all of the preceding paragraphs of the Complaint, as though fully set forth herein.

127.    Metalogix's conduct as alleged herein is unlawful, unfair and fraudulent and has caused actual injury to AvePoint.

128.    AvePoint has built valuable goodwill in the AvePoint® Mark. Metalogix's use of the AvePoint Trademarks is likely to confuse and deceive the public regarding a connection or affiliation between AvePoint and Metalogix and/or the products and retailers linked to from the Infringing Domain Names. This conduct results in damage to AvePoint's goodwill and reputation and unjust enrichment of Metalogix.

129.    Metalogix's conduct has injured AvePoint and, unless enjoined, will continue to cause great, immediate, and irreparable injury to AvePoint.

130.    AvePoint is entitled to injunctive relief and an order for restitutionary disgorgement of all of Metalogix's ill-gotten gains.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray this Court to enter judgment against Defendants granting the following relief:

1.    AvePoint be awarded a preliminary and permanent injunction against Defendants enjoining and restraining Defendants from engaging in any of the following activities: (a) breaching the Separation Agreement; (b) tortiously interfering with the Separation Agreement; (c) using or disclosing AvePoint Confidential Information; (d) defaming AvePoint; (e) tortiously interfering with AvePoint's customer relationships; (f) infringing the AvePoint® Mark; (g) engaging in unfair competition or false designation of origin; (h) cybersquatting; (i) owning, operating, using or benefiting from the Infringing Domain Names; or (j) otherwise violating AvePoint's rights.

2.    Metalogix be compelled to immediately disable the Infringing Domain Names, through a registry hold, lock, or otherwise, and make it inactive and non-transferable so that the

Infringing Domain Names can be re-registered in AvePoint's name and under AvePoint's ownership.

3.      AvePoint be awarded compensatory damages against Defendants in an amount in excess of FIVE MILLION DOLLARS ($5,000,000.00) to be determined at trial;

4.      AvePoint's recovery against Defendants include, without limitation, forfeiture, recoupment and disgorgement of all profits and gains realized by Defendants from the foregoing wrongful acts, and payment of lost profits to AvePoint;

5.      AvePoint's recovery against Luke include, without limitation, forfeiture, recoupment and disgorgement of all compensation paid to Luke;

6.      AvePoint be awarded punitive damages against Luke pursuant to Counts 3 and 4 or as otherwise provided by law;

7.      AvePoint be awarded punitive damages against Metalogix pursuant to Counts 2, 3 and 4 or as otherwise provided by law;

8.      Plaintiffs be awarded a declaratory judgment that the Metalogix Any Capacity Worldwide Non-Compete Agreement is invalid and unenforceable pursuant to Count 5;

9.      AvePoint be awarded monetary damages in an amount to be to be determined at trial, including all of Metalogix's profits or gains of any kind resulting from its willful infringement, said amount to be trebled in view of the intentional nature of the acts complained of herein, pursuant to 15 U.S.C. § 1117.

10.     Plaintiffs be awarded attorneys' fees, costs and expenses against Defendants to the fullest extent permitted by law;

11.     Plaintiffs be awarded interest and costs;

12.     Plaintiffs be awarded such other and further relief as the Court deems proper.

A TRIAL BY JURY IS DEMANDED.

Dated:  February 1, 2018    PLAINTIFFS AVEPOINT, INC.
             AVEPOINT PUBLIC SECTOR, INC.,
             GARY HERMAN


             By:____/s/Joshua F.P. Long___
                Of Counsel

Joshua F. P. Long (VSB#65684)
WOODS ROGERS PLC
Wells Fargo Tower, Suite 1400
10 South Jefferson Street
Post Office Box 14125
Roanoke, Virginia  24038-4125
Telephone No. (540) 983-7600
Facsimile No. (540) 983-7711
jlong@woodsrogers.com

   *Counsel for Plaintiffs*

WOODS ROGERS PLC
ATTORNEYS AT LAW